## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TERESA ALVAREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 22 C 2463 |
| v. | ) | |
| | ) | Magistrate Judge |
| VILLAGE OF PALATINE; DAVID | ) | Daniel P. McLaughlin |
| BRANDWIEN; DAVE DAIGLE; | ) | |
| BRYCE BAKER; MICHAEL | ) | |
| VARGAS; ANGELO CALANCA; | ) | |
| DAVE WEEKS; WILLIAM NORD, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This employment discrimination case is before the Court on Defendants'
motion for summary judgment [76] and Defendants' motion to strike [87]. For the
reasons that follow, Defendants' motion for summary judgment is denied and
Defendants' motion to strike is also denied.

1

## DISCUSSION

## I.   MATERIAL FACTS[1]

### A.   Plaintiff's Hiring with the Palatine Police Department

On March 26, 2018, Plaintiff was hired by the Village of Palatine as a probationary police officer with the Palatine Police Department. Plaintiff was the first sworn Hispanic female officer in the history of the Palatine Police Department. When the Village of Palatine hires a police officer, after successfully graduating from the police academy, the officer is put on probation for a two-year period. During the two-year probationary period, an officer is an at-will employee. Plaintiff began her field training as a probationary officer on July 9, 2018 and started solo patrol on November 16, 2018.

### B.   Plaintiff's Complaints Concerning Balaclavas

On January 29, 2019, Plaintiff approached Defendant Sergeant Bryce Baker regarding the Palatine Police Department's rules and regulations concerning wearing balaclavas. On January 31, 2019, Sergeant Baker provided a memo to Defendant Commander Michael Vargas on the topic. Sergeant Baker's January 31, 2019 memo to Commander Vargas included the following statement:

> Ofc Alvarez didn't feel the balaclava restrictions were fair because of the extreme cold. I told her the same thing I knew yourself and Sgt Murphy had told her: that she is not to wear the attire in the police station, and she is not to wear it continually on the street. The exception being when she is out of the car and in the cold for an extended period of time. I

---

[1] The following facts are derived from the parties' Local Rule 56.1 statements and responses and the exhibits attached thereto. The facts are either undisputed or recitations of evidence presented by the parties bearing upon disputed issues. Citations are provided when the Court specifically refers to exhibits.

explained it is not an approved uniform item, and we as her supervisors, and the Chief, are showing her and others some grace by allowing it to be worn at all in these limited circumstances.

([85-12] at 2.)

Sergeant Baker's January 31, 2019 memo to Commander Vargas further

stated:

I didn't get the feeling she was hearing what I was saying. Later in the shift, Ofc Christudhas told me she approached him twice, both times making statements that we were picking on her because she is female and Hispanic. For clarity, I have not informed Ofc Alvarez that Ofc Christudhas had told me what she said.

(*Id.*)

Sergeant Baker's January 31, 2019 memo to Commander Vargas further

stated:

I called her into the patrol conference room at 0515 hours, and we sat down in the patrol conference room with Sgt Watson. Again, I made sure she understood what the rule was for wearing the balaclava. Several times she specifically said she was being "targeted" and "picked on" as other officers were wearing balaclavas. I explained that at least three, if not four, officers on midnights have been told the same thing as her. She may have been the first person, and the one that drew attention to the issue, but we are being fair across the watch.

(*Id.*)

Sergeant Baker's January 31, 2019 memo to Commander Vargas further

stated:

We went around about this 3-4 times before she *maybe* started to see the light. I think she understands the orders and will not disobey, but I'm not convinced she is done with her complaining about equality. I likewise explained to her that the turtleneck she was wearing was out of regulation, and she needed to buy a PPD mock turtleneck from her uniform allowance. A note was made in her patrol file that we talked about the balaclavas and the turtleneck.

(*Id.*)

### C.  Disputes Between Plaintiff and Officer Castillo

Plaintiff was assigned to work with Officer Francisco Castillo as her beat partner. Plaintiff and Officer Castillo had disputes that ranged from scheduling issues to interpersonal communication. On October 3, 2019, Plaintiff sought counsel from her supervisor and requested that he act as a mediator between her and Officer Castillo. Plaintiff was counseled that she and Officer Castillo were adults and professionals, and that while on duty they both needed to maintain a positive work environment as well as a professional image. Plaintiff was also advised that if she was unable to make it work, her supervisor would speak to Commander Vargas. Plaintiff called her supervisor and told him that because she is older and more mature than Officer Castillo, she was going to make it work without her supervisor's involvement. However, on October 4, 2019, Plaintiff and Officer Castillo got into a verbal altercation in public.

On October 9, 2019, Plaintiff made a written complaint concerning Officer Castillo to Commander Vargas. Plaintiff's October 9, 2019 written complaint to Commander Vargas included the following statement:

> During the winter time, on one of my days off, I went to "Pedro's pizza" to have some food with a male friend of mine. Ofc. Christhudas . . ., Ofc. Ejupovic, and Ofc. Castillo were all working that night and eating at "Pedro's pizza" as well. Immediately Castillo was very inappropriate and unprofessional. He invaded my privacy and began to harass me and my friend by constantly asking my friend various questions (in Spanish) such as: "is Teresa your girlfriend, where did you guys come from, you came in the same car, you're leaving in the same car?" To which I told my friend (in Spanish) to not answer any of his questions as it was inappropriate for him to be asking him said questions. The other officers

4

> present shortly engaged in this conversation but realized I was very uncomfortable and ceased the questioning. I told them very directly that he was not my boyfriend, just a friend, and to stop asking us questions. The other officers respected my personal life and privacy, however, Castillo continued to engage my friend and continued to ask . . . him questions. To which I again told my friend to ignore Castillo's questions, as he had no right to be asking him anything. Castillo then made inappropriate remarks such as me liking younger men. Shortly after I left the restaurant. My friend expressed that he felt very uncomfortable, I had to apologize for Castillo's inappropriate questioning and remarks.

([85-11] at 3.)

Plaintiff's October 9, 2019 written complaint to Commander Vargas further

stated:

> I volunteered for summer camp on 07/18 and 07/24. I attended "Main Event Arcade" and "Foster Ave.'s beach" days respectively. Ofc. Castillo and I had not had any encounters since the end of March (when I left midnight shift) until these events. During these events, he constantly made negative remarks about my involvement with the kids and constantly would nag me or try to pick fights with me. Officer Gonzalez . . . was present during said incidents and at first thought Castillo was joking with me. I clarified with Ofc. Gonzalez that Castillo was not playfully bullying me, he meant what he was saying to me. Gonzalez asked why we weren't getting along? I answered that I didn't know why he had issues with me. Only thing I could think of was the scheduling issues from the past. I decided to not complain to a sergeant about Castillo's negative remarks and constant desire to bicker with me, as I would not see him past these events until later this year when I returned to midnight shift.

(*Id.*)

Plaintiff's October 9, 2019 written complaint to Commander Vargas further

stated:

> Castillo's condescending and bullying ways ensued once I was back on midnights. I was hoping his unprofessional behavior towards me would cease, it did not. Castillo continued to create a hostile work environment for me upon my return to midnight shift.

(*Id.*)

Plaintiff's October 9, 2019 written complaint to Commander Vargas further

stated:

> [On September 10, 2019] [s]ometime between 0333 hours and 0346
> hours (when I was 23), Castillo decided to be very unprofessional and
> type the entire midnight shift, the following, not verbatim: I hope
> Alvarez clears her personal and takes this call in her beat, so I can finish
> my domestic reports." During the course of his investigation he learned
> the 10-57 had not occurred in my beat, but in 8170's beat. He called it
> over the air and 8170 was shortly en route. I responded on the MDT with
> the following words, not verbatim: I'm glad we figured out the incident
> did not occur in my beat, now you can go finish your reports. Castillo
> then responded with another inappropriate comment, which I decided
> was best to ignore as being unprofessional on the MDT is not proper. A
> few officers commented (in person to me) that Castillo's bashing
> remarks toward me on the MDT were uncalled for.

(*Id.* at 4.)

Plaintiff's October 9, 2019 written complaint to Commander Vargas further

stated:

> On 10/01/19 at approximately 2305-2321 hours, I called dispatch to ask
> them to correct the inadvertent mistake Castillo had made. He called
> himself 23 at 228 E. Rimini Ct. as 8180 (he was 8181 that night). When
> I attempted to sign on as 8180, I was automatically placed as 23 at 228
> E. Rimini Ct. (where Castillo and Rusch were currently at). Once the
> issue was resolved by dispatch, I typed Castillo on the MDT to remind
> him he was 8181 that night. I also typed Castillo on the MDT (not
> verbatim): good job on catching Rojas, Reyes. In hopes of creating a
> positive work environment. Castillo never acknowledged either
> message. Later that night, on 10/02/19 during the time frame of 0003-
> 0527 hours, Castillo and Rusch added me to their private MDT chat. I
> skimmed through their multiple messages as I was preoccupied
> translating for CCSO on a traffic stop. I read the last part of their
> messages in which they were asking for more info on a buick, which I
> assumed to be affiliated to Delgado, Arturo. I subsequently typed them
> the 28 for Delgado's buick and information on Delgado's other known
> vehicle. Castillo responded very disrespectfully (not verbatim): that's
> not the buick we are referring to, get out of our chat, nobody wants you
> here. They had accidentally added me to their chat. I didn't respond to
> his disrespectful and unprofessional statements on the MDT, again I
> decide not to engage and I ignored him.

6

(*Id.* at 4-5.)

Plaintiff's October 9, 2019 written complaint to Commander Vargas further

stated:

> Castillo's repeat unprofessional behavior toward me, compelled me to
> speak to and inform Sergeant Murphy about the reoccurring and now
> escalating unprofessional behavior from Castillo toward me. On
> 10/03/19, shortly after the group text, I went into the station and
> explained to sergeant Murphy that I had exhausted all means of
> attempting to stop Castillo's condescending and unprofessional behavior
> toward me and I hoped that Sergeant Murphy could address the issue.
> I had previously mentioned to sergeant Murphy how difficult and
> unprofessional Castillo had been in regards to the schedule. On 10/03/19
> I elaborated on most, if not all, most recent and past incidents between
> Castillo and I.

(*Id.* at 5.)

Plaintiff's October 9, 2019 written complaint to Commander Vargas further

stated:

> [On October 3, 2019] I stayed on scene until 0418 hours when the tow
> arrived. I stayed on scene for an extended period of time, yet Castillo
> never showed his beat integrity that he claims I lack. Castillo then
> inappropriately accused me of staying long on the call because I was
> "flirting" with the young boy. I corrected Castillo by stating facts. I was
> helping the subject with making phone calls to his parents, girlfriend,
> and personal tow company as his phone was not working. The subject
> was trying to avoid paying our tow company. Ultimately, the subject
> used our tow company.

(*Id.* at 6.) Officer Castillo was never disciplined or reprimanded in connection with

any complaint brought against him by Plaintiff. ([85-1] at 6.)

The October 4, 2019 verbal altercation between Plaintiff and Officer Castillo

was investigated and subsequently referred to Defendant David Daigle, the Chief of

Police. Chief Daigle met with Plaintiff and indicated that both Plaintiff and Officer

Castillo had engaged in "unprofessional" conduct. Chief Daigle advised Plaintiff

that Officer Castillo would be given the same message she received. Chief Daigle took the opportunity to discuss his concern with Plaintiff's progress, telling her that he was aware that she was failing to meet the minimal policing standards required by the Palatine Police Department. Chief Daigle also advised Plaintiff that she was at a crossroads of her career, and that she needed to do some soul searching to determine if law enforcement was the right career for her.

**D. Plaintiff's Quarterly Performance Evaluations**

*1. Plaintiff's January 2019 Performance Evaluation*

Two of the Palatine Police Department's assessment categories are rated on a subjective basis, namely, "Neighborhood Based Policing" and "Professionalism/Proactive Asset to the Organization." In January 2019, Sergeant Morris completed a quarterly evaluation form for Plaintiff that provided ratings for Neighborhood Based Policing and Professionalism/Proactive Asset to the Organization. For individual categories, the rating scale is as follows: a rating of 0 corresponds to "Below Not Satisfactory"; a rating of 1 corresponds to "Not Satisfactory"; a rating of 2 corresponds to "Below Expectations"; a rating of 3 corresponds to "Meets Expectations"; a rating of 4 corresponds to "Exceeds Expectations"; and a rating of 5 corresponds to "Outstanding." ([85-5] at 2.) The overall rating scales is as follows: a total rating below 5 corresponds to "Below Not Satisfactory"; a total rating of 5-9 corresponds to "Not Satisfactory"; a total rating of 10-14 corresponds to "Below Expectations"; a total rating of 15-19 corresponds to "Meets Expectations"; a total rating of 20-22 corresponds to "Exceeds Expectations";

8

and a total rating of 23-25 corresponds to "Outstanding." (*Id.* at 4.)

With respect to Neighborhood Based Policing, Plaintiff's January 2019 evaluation form stated:

> I instructed Ofc. Alvarez on my expectations on NBP, and on selective enforcement. She did exactly what I asked of her. Ofc. Alvarez provided me with her first NBP report that was loaded with relevant content. Ofc. Alvarez attacked my selective enforcements and did over 30 hours on them in her 6 weeks on the street. Due to Ofc. Alvarez just being released to patrol there were no directed patrol opportunities for her.

([85-5] at 3.) Plaintiff received a rating of 3 (Meets Expectations) for Neighborhood Based Policing. (*Id.*)

With respect to Professionalism/Proactive Asset to the Organization, Plaintiff's January 2019 evaluation form stated:

> On at least two occasions Ofc. Alvarez was counseled about improving her time management skills. The first incident involved a crash report with no DL arrest that took her over two days to complete. A second instance was when Ofc. Alvarez worked late to complete a lost passport which was dispatched to her at 0730 at the beginning of her shift.

(*Id.* at 4.) Plaintiff received a rating of 2 (Below Expectations) for Professionalism/Proactive Asset to the Organization. (*Id.*) Plaintiff received an overall rating of 14 on her January 2019 quarterly evaluation, which equated to Below Expectations and was one point shy of Meets Expectations. (*Id.*)

### 2. *Plaintiff's April 2019 Performance Evaluation*

In April 2019, Sergeant Murphy completed a quarterly evaluation form for Plaintiff that provided ratings for Neighborhood Based Policing and Professionalism/Proactive Asset to the Organization. With respect to Neighborhood Based Policing, Plaintiff's April 2019 evaluation form stated:

> Officer Teresa Alvarez turned in monthly reports each month, containing relevant beat contacts and information. Teresa took initiative in updating several business contact cards within her first rotation on midnights. Teresa also completed three Directed Patrols in the first quarter of 2019. All three Directed Patrols involved Teresa locating vehicles on the Department's Denver Boot list for outstanding parking citations.

([85-6] at 3.) Plaintiff received a rating of 4 (Exceeds Expectations) for

Neighborhood Based Policing. (*Id.*)

With respect to Professionalism/Proactive Asset to the Organization,

Plaintiff's April 2019 evaluation form stated:

> While not yet assigned any specialties, Ofc. Alvarez seeks out volunteer opportunities. She gladly provides relief in the radio room when needed as well as offering Spanish language skills. Ofc. Alvarez not only assists her fellow Palatine officers with matron duties, she often got called out to neighboring agencies to help them with the search of female prisoners.

(*Id.* at 4.) Plaintiff received a rating of 3 (Meets Expectations) for

Professionalism/Proactive Asset to the Organization. (*Id.*) Plaintiff received an

overall rating of 15 on her April 2019 quarterly evaluation, which equated to Meets

Expectations. (*Id.*)

### 3. *Plaintiff's July 2019 Performance Evaluation*

In July 2019, Defendant Sergeant Brandwein completed a quarterly

evaluation form for Plaintiff that provided ratings for Neighborhood Based Policing

and Professionalism/Proactive Asset to the Organization. With respect to

Neighborhood Based Policing, Plaintiff's July 2019 evaluation form stated:

> Ofc Alvarez turns in her monthly reports in a timely fashion. Her beat reports contain an accurate account of her NBP activity. During the 2nd quarter, Ofc Alvarez was assigned to 8150 on the Evening Shift. She participated in one (1) Directed Patrol during the 2nd quarter, which

was initiated by the beat sergeant (DP #8150-19-21). It involved evaluating two (2) permit parking zones in 8150 in order to determine if they were still a necessity to maintain. While Ofc Alvarez has a total of four (4) Directed Patrols for the year, three (3) of them are denver boots, and one (1) was assigned to all the 8150 day and evening shift officers by the beat sergeant (DP #8150-19-21). During her upcoming tour in 8120 on the day shift, I would like to see her focus on creating at least one problem solving Directed Patrol to improve the quality of life within the beat. This would include the following: Identify a Problem (citizen, neighborhood, business, etc.), and then mitigate / eliminate this problem through a sustained effort throughout the 3rd quarter.

([85-7] at 5.) Plaintiff received a rating of 3.75 (Meets Expectations) for

Neighborhood Based Policing. (*Id.*)

With respect to Professionalism/Proactive Asset to the Organization,

Plaintiff's July 2019 evaluation form stated:

Ofc. Alvarez used one (1) sick day during the 2nd quarter, and has used two (2) throughout the year. Ofc Alvarez was also utilized frequently for her specialty as a language translator (Spanish), for which she did a nice job. In April Ofc Alvarez volunteered to represent the department at the funeral of an ISP Trooper killed in the line of duty. During the 3rd quarter I would like to see Ofc Alvarez become involved with some community events, such as the Icompete Day Camps that are held in July.

(*Id.* at 4.) Plaintiff received a rating of 3 (Meets Expectations) for

Professionalism/Proactive Asset to the Organization. (*Id.*) Plaintiff received an

overall rating of 14 on her July 2019 quarterly evaluation, which equated to Below

Expectations and was one point shy of Meets Expectations. (*Id.*)

### 4.    *Plaintiff's October 2019 Performance Evaluation*

In October 2019, Sergeant Dowd completed a quarterly evaluation form for

Plaintiff that provided ratings for Neighborhood Based Policing and

Professionalism/Proactive Asset to the Organization. With respect to Neighborhood

Based Policing, Plaintiff's October 2019 evaluation form stated:

> Ofc. Alvarez has adjusted well to the 8120 beat. Her monthly activity reports contain numerous interactions with the 8120 beat citizens and business. She has volunteered at the Summer Camps and the Special Olympics fundraiser at Culvers. She makes a strong effort to get to know people and businesses. So far, Ofc. Alvarez has made a good impression in the 8120 beat. Ofc. Alvarez has submitted all of her beat reports in a timely manner.

([85-8] at 5.) Plaintiff received a rating of 4 (Exceeds Expectations) for

Neighborhood Based Policing. (*Id.*)

With respect to Professionalism/Proactive Asset to the Organization,

Plaintiff's October 2019 evaluation form, completed by Commander Watson, stated

in part:

> Officer Alvarez used zero sick days during the 3rd quarter period. Officer Alvarez is always eager to help with Spanish language translation, which is a benefit to the shift. Officer Alvarez volunteered two days to work the iCompete Summer camp, which is a great way for the newer officers to get involved with the youth of our town. She also made an appearance at the Butterburgers for Badges Special Olympic fundraiser at Culver's. On at least a few occasions Ofc. Alvarez was unreachable at the end of her shift during shift change. . . .

(*Id.* at 4.) Plaintiff received a rating of 2 (Below Expectations) for

Professionalism/Proactive Asset to the Organization. (*Id.* at 3) Plaintiff received an

overall rating of 14 on her October 2019 quarterly evaluation, which equated to

Below Expectations and was one point shy of Meets Expectations. (*Id.*)

> 5. *Other Officers' Ratings in Professionalism/Proactive Asset to the Organization*

With respect to the Professionalism/Proactive Asset to the Organization

category, another male police officer with the Palatine Police Department received a

rating of 3 (Meets Expectations) without any indication that he participated in

public volunteer activities. ([85-10] at 3.) Further, other white and/or male police officers with the Palatine Police Department regularly receive ratings of 4 (Exceeds Expectations) in the Professionalism/Proactive Asset to the Organization category without any indication that the officers participated in public volunteer activities. (*Id.* at 5, 13, 15, 17.) Officer Castillo, Plaintiff's beat partner, received a rating of 4 (Exceeds Expectations) for Professionalism/Proactive Asset to the Organization without any indication that he participated in public volunteer activities. (*Id.* at 7.) Plaintiff never received a rating of 4 (Exceed Expectations) for Professionalism/Proactive Asset to the Organization. The Palatine Police Department never promoted a female to the sergeant position from the time of its inception until the time of Plaintiff's separation. ([85-1] at 5-6.)

### 6. *Plaintiff's Final Quarterly Performance*

In her fourth quarter – September 2019 to December 2019 – a quarterly performance evaluation was not completed for Plaintiff. However, Plaintiff kept track of her own quantitative performance numbers and prepared a document. ([85-18].) Plaintiff testified as follows regarding her fourth quarter statistics:

> I was waiting for my end-of-the-year evals because I went above and beyond with meeting the requirements that I was being – that I was failing, which they refused to give to me when I asked her two times – so I was waiting for that day to come when I finally went above meets in most categories, only two – sorry – it was most of them outstanding, one or two at above meets, and only one at meets. Nothing fell below that. . . . I went and met my numbers and I kept tally of everything.

([85-4] at 233:1-22.)

E.    **The January 7, 2020 Traffic Stop**

On January 7, 2020, Plaintiff conducted a traffic stop during which Plaintiff discovered that the driver was driving with a suspended license and illegally transporting cannabis. However, Plaintiff decided not to charge the driver for driving on a suspended license, which was within her discretion. Instead, Plaintiff used her discretion and decided to only charge the driver with illegally transporting cannabis. Plaintiff contacted her supervisor for guidance during the traffic stop. During Plaintiff's investigation, the driver's girlfriend and the registered owner of the car came to the scene, but neither had a valid driver's license. Plaintiff allowed the owner to drive the vehicle home and instructed a fellow officer to follow her home. With respect to her decision to allow the car to be driven home in that fashion, Plaintiff testified as follows:

> Q.    Ultimately, you allowed someone with a suspended license to take this car back to his house, right?
>
> A.    Yes, because I was told to do that on a previous call by a supervisor. I was allowed to do that, so I thought it was standard procedure. . . . [T]he driver was . . . sent with the ambulance for medical care, and his brother did not have a license, whether it was suspended or revoked license, I don't know. . . . But I told Sergeant Murphy he can't drive, he said, just follow him home. . . . So based on approval from a previous incident with somebody who shouldn't lawfully be driving can – as long as I was following them, it was okay by a sergeant. . . . It was the same procedure that was okayed by a supervisor for me to do. . . .
>
> Q.    Sergeant Murphy has given you the green light for whatever reason, whether they are unlicensed, suspended or revoked, and that it's okay to allow someone to drive if somebody follows them, yes?
>
> A.    As long as the officer followed them, which was me, yes.

([85-4] at 262:23-263:4; 264:17-265:11; 305:1-6.)

14

It was later determined that Plaintiff had committed policy violations in relation to the January 7, 2020 traffic stop. Sergeant Morris prepared a Critical Incident report dated January 8, 2020. ([77-23] at 1.) The Critical Incident report noted that: Plaintiff "had information about the driver having a suspended driver's license that she failed to inform [Sergeant Morris] of."; Plaintiff "failed to document in her report that she sought counsel from a supervisor as to how to proceed with the tow."; "contraband was in close proximity to the offender in the car" and Plaintiff "walk[ed] away from the offender and the vehicle to further her investigation, but fail[ed] to take custody of the contraband."; Plaintiff "indicated that the driver of the vehicle was in front of his house" but "the subject was not in direct proximity to his residence."; Plaintiff "turned the vehicle over to the owner who possessed a suspended driver's license and allowed it to be driven by that owner."; and Plaintiff "placed the evidence (suspect cannabis) on the counter by the computer then asked a fellow officer to watch it, and then left it unattended." (*Id.* at 1, 7.)

Defendant Deputy Chief William Nord prepared a memo to Chief Daigle dated January 14, 2020. ([77-23] at 2-6.) The memo concluded that there had been several policy violations. Deputy Chief Nord's January 14, 2020 memo to Chief Daigle included the following statement:

> Officer Alvarez failed to disclose relevant information to Sergeant Morris about the driver having a suspended driver's license because she did not want to tow the vehicle. She provided Sergeant Morris with a misleading statement indicating that the driver was parked at his residence. Sergeant Morris was unable to make an informed decision due to not being given all of the facts of the case.

15

(*Id.* at 4.)

Deputy Chief Nord's January 14, 2020 memo to Chief Daigle further stated:

In her report narrative, Officer Alvarez stated "the traffic stop was conducted a few feet away from their residence" when in fact, the traffic stop occurred in the roadway approximately .32 miles away from the residence. Officer Alvarez allowed the registered owner to drive the vehicle from the scene, but failed to document that the registered owner had a suspended driver's license. Additionally, in her report narrative, Officer Alvarez wrote, "Amber D. Perfecto, owner of the vehicle, arrived on scene a few minutes later,", when Perfecto actually arrived at the scene of the traffic stop approximately 30 minutes after Officer Alvarez initiated the traffic stop.

(*Id.* at 5.)

Deputy Chief Nord's January 14, 2020 memo to Chief Daigle further stated:

Officer Alvarez failed to arrest the driver for driving while his driving privileges were suspended and did not tow the vehicle. She arrested the driver for possession of adult use cannabis in a motor vehicle, and released the vehicle to the registered owner who arrived on scene approximately 30 minutes after the traffic stop was initiated. Officer Alvarez allowed the registered owner, whose driving privileges were also suspended, to drive the vehicle home from the scene which was on a public roadway.

(*Id.*)

Deputy Chief Nord's January 14, 2020 memo to Chief Daigle further stated:

Officer Alvarez left contraband (bag of cannabis) unattended in the report writing area at the police station. Sergeant Morris observed the contraband left unattended. He took the bag of cannabis and secured it in a temporary property locker. It was undetermined how long Officer Alvarez left the contraband unattended while she was in the records area of the station speaking to the desk assistant in the radio room.

(*Id.* at 6.)

### F.     <u>Plaintiff's Separation from the Palatine Police Department</u>

Plaintiff's employment with the Palatine Police Department was separated on January 18, 2020. Deputy Chief Nord testified that he "made a recommendation to Chief Daigle that – to not have [Plaintiff] employed by the Police Department any longer." ([85-16] at 11:13-23.) Chief Daigle testified that he made the decision to terminate Plaintiff's employment and/or offer her the opportunity to resign. ([85-13] at 78:1-19.) Chief Daigle testified that "[t]he discussion of terminating [Plaintiff's] employment only began after the January 7th [traffic stop]." (*Id.* at 80:18-22.) With respect to his decision to terminate Plaintiff's employment, Chief Daigle testified as follows:

> Q.     [W]hat are the reasons you have in your mind for [Plaintiff's] separation?
>
> A.     The reasons in my mind for Officer Alvarez' separation would involve not progressing through training. It would involve repeated violations of policy. It would involve the incident on the night of January 7, 2020, involving a traffic stop. I think off the top of my head that would be – that would be it.

([85-3] at 27:24-28:8.)

On January 18, 2020, Chief Daigle met with Plaintiff and read from a script that stated:

> Teresa, you are not meeting my expectations as a probationary police officer with this department. I have considered recent events, including the incident on January 7, 2020, and other aspects of your performance and conduct as a member of this department during your probationary period. Accordingly, I have decided to terminate your employment with the Department. Unless this matter is otherwise resolved, you are being dismissed as a probationary officer with the Palatine Police Department, effective immediately. . . .
>
> Here is a letter confirming my decision to terminate your employment.

17

> You should turn over all Department issued equipment to the Deputy Chief before you leave the building. You will be sent a separate letter concerning insurance continuation from the Village's Human Resource Department. You can contact HR on Monday with any questions regarding insurance or payout of your accrued time.

> You are dismissed.

([85-17] at 3.)

On January 18, 2020, Plaintiff was given a letter signed by Chief Daigle that stated, in part:

> You are hereby dismissed as a probationary officer with the Palatine Police Department. Your employment is hereby terminated, effective immediately. Notice of this discharge will be sent to the Palatine Police and Fire Commission.

(*Id.* at 2.) Plaintiff signed a document dated January 18, 2020 that stated: "Effective January 18, 2020, I am officially resigning my position as a Palatine Police Officer." ([77-5] at 1.) Plaintiff was approximately two months away from completing her probationary period at the time of her separation. ([85-1] at 4.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient." *Johnson v. Doughty*, 433 F.3d 1001, 1009-10 (7th Cir. 2006)

(quotations and alterations omitted). However, the court is to "construe the record and all reasonable inferences that may be drawn from it in the light most favorable to the nonmoving party." *Thompson Corrugated Sys., Inc. v. Engico, S.R.L.*, 111 F.4th 747, 751 (7th Cir. 2024) (citation omitted).

## III.   ANALYSIS

### A.   <u>Defendants' Motion for Summary Judgment</u>

#### 1.   *<u>Plaintiff's Discrimination Claims</u>*

Plaintiff has asserted sex, race, and national origin employment discrimination claims against Defendants under the Illinois Human Rights Act, Title VII of the Civil Rights Act of 1964, and § 1981 of the Civil Rights Act of 1866. *See* 775 ILCS § 5/1-101 et seq.; 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 1981. Defendants assert that they are entitled to judgment as a matter of law on those claims. The parties appear to agree that the same legal standards apply to all of Plaintiff's claims. *See Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 n.2 (7th Cir. 2021); *Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 714 (7th Cir. 2021) ("Mahran brought this claim under three statutes – Title VII, 42 U.S.C. § 1981, and the IHRA – but the legal standard is the same under all three."); *Dirickson v. Intuitive Surgical, Inc.*, 657 F. Supp. 3d 1103, 1120 (N.D. Ill. 2023) ("Courts apply the well-established Title VII legal standard to IHRA discrimination claims.").

A plaintiff seeking to establish employment discrimination may proceed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, to establish a prima facie case of

discrimination, a plaintiff must offer evidence that: "(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (citation omitted). "Once a prima facie case is established, a presumption of discrimination is triggered" and "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for its action." *Id.* (citation and internal quotations omitted). "When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a 'pretext,' which in turn permits an inference of unlawful discrimination." *Id.* (citations omitted).

In this case, "Defendants neither dispute that Plaintiff belongs to a protected class, nor that Plaintiff suffered an adverse employment action when she was terminated on January 18, 2020." ([78] at 5.) The initial questions thus become whether Plaintiff's job performance met the Palatine Police Department's legitimate expectations and whether similarly-situated individuals who are not in her protected class were treated more favorably than Plaintiff. The Court finds that these two issues are intertwined in this case and concludes that there are genuine issues of fact as to both. Pertinent to that conclusion, Defendants assert that "Plaintiff was given the option to resign *in lieu* of termination due to her poor performance." (*Id.* at 10.) However, Plaintiff asserts that her performance was

evaluated in a discriminatory fashion. Along those lines, Plaintiff argues that "Defendants intentionally and discriminatorily scored Plaintiff low in the Professionalism/Proactive Asset to the Organization category when compared to other probationary officers" and she was "being held to a higher standard and being subjected to discriminatory subjective ratings that adversely affected her overall reviews as an officer." ([83] at 13-14.) Plaintiff has presented evidence that can support those assertions.

Specifically, as outlined above, and construing the record in the light most favorable to Plaintiff, she has presented evidence suggesting that she was meeting her performance expectations in her fourth quarter at the time she was terminated. Further, Plaintiff has presented evidence showing that other white and/or male probationary officers with the Palatine Police Department[2] received higher ratings than her while putting in less effort, regularly receiving ratings of "4" in the subjective "Professionalism" category while Plaintiff never received higher than a "3". The Court notes that Plaintiff was one point short of hitting Meets Expectations on three of her quarterly evaluations. Ultimately, there are questions of material fact concerning the second and fourth elements of Plaintiff's *prima facie* case that preclude summary judgment in Defendants' favor. *See Keiju Pu v. Columbia Coll. Chicago*, 934 F. Supp. 2d 964, 972 (N.D. Ill. 2013) ("[T]he court concludes that whether Pu met Columbia's legitimate employment expectations is a question of

---

[2] Applying common sense, the Court finds that the other officers – also probationary officers with the Palatine Police Department – are suitable comparators because there are "enough common features between the individuals to allow a meaningful comparison." *Coleman*, 667 F.3d at 841 (citation and internal quotations omitted).

fact that cannot be resolved at summary judgment."); *Coleman*, 667 F.3d at 846-47 ("Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue.") (citation and internal quotations omitted).

Assuming Plaintiff can establish her *prima facie* case, Defendants here have offered a legitimate, nondiscriminatory reason for Plaintiff's discharge – namely, Plaintiff's asserted policy violations in relation to the January 7, 2020 traffic stop. Accordingly, under the burden-shifting framework, the next question becomes whether Plaintiff can show that Defendants' offered reasons are pretextual. To show that an employer's proffered legitimate, nondiscriminatory reasons are pretextual, a plaintiff "must present evidence suggesting that the employer is dissembling." *Coleman,* 667 F.3d at 852 (citation omitted). To meet her burden of establishing pretext, a plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in [the employer's] asserted reason that a reasonable person could find [it] unworthy of credence." *Id.* (citations and internal quotations omitted). "[I]f the stated reason, even if actually present to the mind of the employer, wasn't what induced [the employer] to take the challenged employment action, it was a pretext." *Id.* at 853. (citation omitted). Ultimately, "the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Id.* at 852 (citation omitted).

In this case, Plaintiff has come forward with evidence suggesting weaknesses and inconsistencies in Defendants' reliance on the January 7, 2020 traffic stop as the reason for her separation. For instance, while Plaintiff was faulted for not charging the offender with driving on a suspended license, it is undisputed that it was within Plaintiff's discretion to charge the driver with the cannabis offense and not the suspended license offense. Further, while Plaintiff was faulted for allowing a driver with a suspended license to drive the car home (with an officer following her), Plaintiff testified that she was instructed to follow that procedure on a previous occasion. ([85-4] at 262:23-263:4; 264:17-265:11; 305:1-6.) Accordingly, the Court concludes that there are genuine issues of fact as to pretext. *See Coleman*, 667 F.3d at 853 ("Based on this evidence here, a reasonable jury could conclude that the Postal Service's stated reason for firing Coleman was pretextual."); *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 564 (7th Cir. 2019) ("For the foregoing reasons, we agree that plaintiff raised a triable issue of fact as to whether the nondiscriminatory reasons defendants gave for terminating plaintiff were pretextual.").

The Seventh Circuit has clarified that the ultimate question in employment discrimination cases "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). As such, "[d]iscrimination claims may survive summary judgment when a plaintiff presents evidence that permits a reasonable factfinder to conclude that the employer took an

23

adverse action against the employee because of the employee's race or national origin." *de Lima Silva*, 917 F.3d at 559. In the instant case, there are genuine issues of fact concerning Plaintiff's job performance, Defendants' treatment of comparators, and pretext. And, overall, Plaintiff has come forward with evidence that would allow a reasonable jury to conclude that Plaintiff was subject to different terms of employment and ultimately terminated based on her sex, race, and/or national origin. Accordingly, Defendants' motion for summary judgment must be denied to the extent it seeks a blanket dismissal of Plaintiff's employment discrimination claims.

### 2.    *Plaintiff's Hostile Work Environment Claims*

Within her discrimination claims, Plaintiff has asserted that she was subjected to a hostile work environment. To state a claim for discrimination based on a hostile work environment, a plaintiff must show that "(1) they were subject to unwelcome harassment; (2) the harassment was based on their [membership in a protected category]; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (citation omitted). The conduct alleged must be "sufficiently severe or pervasive to alter the conditions of employment." *Id.* (citation omitted). Whether conduct meets this bar depends on "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an

employee's work performance." *Id.* (citation omitted). "[T]he standard may be met by a single extremely serious act of harassment or by a series of less severe acts." *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018) (citations omitted). "Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Johnson*, 892 F.3d at 900 (citation omitted). However, "the environment need not reach the point of 'hellishness,' as some cases once argued." *Id.* at 901. Further, "[r]esilient employees who manage to perform well in trying circumstances may still prove a hostile environment claim." *Robinson*, 894 F.3d at 830.

In this case, construing the record in the light most favorable to Plaintiff, there is evidence suggesting that Plaintiff was subject to severe or pervasive harassment due to her sex that altered the conditions of her employment. Indeed, as outlined above, there is evidence that over a period of time Officer Castillo directed numerous inappropriate comments of a sexualized nature to Plaintiff and otherwise behaved in a condescending and abusive manner. ([85-11] at 3-6.) Crucially, "[w]hether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Johnson*, 892 F.3d at 901 (citations omitted). The Court sees no reason to deviate from that general rule in this case and finds that such a question of fact exists here. *See id.* ("In order to remove such a question of fact from the jury on summary judgment, the court would have to determine that no reasonable jury could find the conduct at issue severe or pervasive. In this case, it is certainly possible that a reasonable jury

25

could find that the conduct was pervasive or severe based on the claims of racially derogatory speech used by Aramark supervisors."); *Dirickson*, 657 F. Supp. 3d at 1129 ("Construing the evidence in her favor, the jury could reasonably find that the work environment Plaintiff complains of – consisting of verbal and physical intimidation by her supervisor, a culture of sexism toward women, and the imposition of more difficult standards for work performance compared to men – is sufficiently severe or pervasive to constitute an actionable hostile work environment.").

However, "[a] showing of severe or pervasive harassment is necessary but not sufficient to survive summary judgment." *Johnson*, 892 F.3d at 904. "The plaintiffs must also demonstrate a basis for employer liability." *Id.* "[E]mployers are strictly liable for the discriminatory acts perpetrated by supervisors and they are liable for the discriminatory acts of others – coworkers, independent contractors, customers, inmates etc. – only if they are negligent either in discovering or remedying the harassment." *Id.* (citation omitted). "An employer is negligent in remedying harassment if 'it failed to take prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.'" *Saxton v. Wolf*, 508 F. Supp. 3d 299, 311 (N.D. Ill. 2020) (citation omitted). "The plaintiff bears the burden of showing that the employer knew of the problem and that the employer did not act reasonably to remedy the issue once it had knowledge." *Johnson*, 892 F.3d at 904. The Court finds that Plaintiff has met her burden in that regard here. Plaintiff has come forward with evidence that Plaintiff's supervisors were notified of Officer

Castillo's (coworker) harassing behavior on several occasions, but ultimately never reprimanded Castillo and only told him he was acting "unprofessionally." The Court concludes that a reasonable jury could determine that that fell short of Defendants' duty to undertake appropriate corrective action and act reasonably to remedy Officer Castillo's abusive behavior. Accordingly, Defendants' motion for summary judgment must be denied as to Plaintiff's hostile work environment claims.

### 3. *Plaintiff's Retaliation Claims*

Plaintiff has asserted claims that Defendants retaliated against her for engaging in protected activity. To make out a claim for retaliation, "a plaintiff must demonstrate (1) that he engaged in statutorily protected activity; (2) that his employer took a materially adverse action against him; and (3) that the protected activity and the adverse action are causally connected." *Robinson*, 894 F.3d at 830 (citations omitted). To prove causation, the plaintiff must show that "the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (citations omitted). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* A retaliation claim "survives summary judgment if the plaintiff presents evidence that, 'considered as a whole,' would allow a reasonable jury to find that her protected activity caused an adverse employment action." *Saxton*, 508 F. Supp. 3d at 313 (citation omitted).

In this case, Plaintiff engaged in protected activity when she, *inter alia*, complained about unequal treatment concerning balaclavas and complained about

Officer Castillo's abusive conduct. Further, the Court finds that there is evidence that could lead a reasonable jury to conclude that Defendants terminated Plaintiff's employment because they were simply tired of her "complaining about equality" and raising complaints regarding chauvinistic behavior. As such, Defendants are not entitled to summary judgment on Plaintiff's retaliation claims. *See Dirickson*, 657 F. Supp. 3d at 1124 ("The [retaliation] inquiry boils down to one question: Does the record contain sufficient evidence to permit a reasonable factfinder to conclude that retaliatory motive caused the materially adverse action?").

### 4. *Qualified Immunity*

The individual Defendants maintain that they cannot be held liable because they are entitled to qualified immunity. Qualified immunity protects a public official from money damages "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *de Lima Silva*, 917 F.3d at 565 (citation omitted). "A right is clearly established when existing precedent places it 'beyond debate.'" *Id.* (citations omitted). Courts have recognized that "[t]he constitutional right to be free from [racial or gender] discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it." *Wimbley v. Cashion*, 588 F.3d 959, 963 (8th Cir. 2009) (citation omitted); *see also Flores v. Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980) ("No official can in good faith impose discriminatory burdens on a person or group by reason of a racial or ethnic animus against them. The

28

constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it.").

Based on this authority, the individual Defendants here are charged with the knowledge that discriminating against Plaintiff based on her sex, race, or national origin would violate Plaintiff's well-established constitutional rights. Further, in the specific context of this case, the Court finds Plaintiff has come forward with enough evidence that the individual Defendants engaged in such objectionable discriminatory conduct that could lead a reasonable jury to conclude the individual Defendants in fact violated Plaintiff's constitutional rights. *See de Lima Silva*, 917 F.3d at 565 ("Plaintiff presented sufficient evidence such that a reasonable jury could find that Champagne terminated plaintiff because of his race and national origin. And if a jury draws that inference, it is of course true that Champagne's actions would violate clearly established law. It is well-established that terminating an employee on the basis of his protected status – including race or national origin – violates the Equal Protection Clause of the Fourteenth Amendment. . . . Therefore, qualified immunity does not shield Champagne from liability here."); *Ayyaz v. City of New York*, No. 19-CV-01412-LTS-SN, 2021 WL 1225684, at *5 (S.D.N.Y. Mar. 31, 2021) ("The Court finds that Plaintiff had the clearly established constitutional right to be free from sexual harassment, and race and sex discrimination, by a state actor, and that no reasonable person would believe the alleged actions of Defendants Thaler and Singh towards Plaintiff were lawful on the night of August

22, 2017."). Accordingly, qualified immunity does not shield the individual Defendants from liability.

### 5. *Defendants David Weeks and Angelo Calanca*

Defendants argue in particular that Defendants Dave Weeks and Angelo Calanca cannot be held liable because they did not cause, participate in, or have knowledge of the constitutional deprivations alleged by Plaintiff. With respect to Officer Weeks, it is undisputed that he did not train or directly supervise Plaintiff and Plaintiff did not directly report to Officer Weeks. Officer Weeks never observed Plaintiff as a probationary police officer. Further, Officer Weeks did not review any of Plaintiff's performance evaluations, did not write any evaluations, and was not involved in any way with the evaluation of Plaintiff. However, Plaintiff testified that Officer Weeks yelled at and berated her in a threatening fashion on various occasions. ([85-4] at 46:24-47:1; 145:2-146:4; 148:2-4.) Accordingly, the Court finds that there is a genuine issue of fact as to whether Officer Weeks caused or participated in the alleged constitutional deprivations. With respect to Officer Calanca, Defendants maintain in their memorandum that "there is no evidence in the record tying [him] to any discriminatory conduct." ([78] at 11.) However, in their Local Rule 56.1 statement of facts, Defendants have offered no facts whatsoever regarding Officer Calanca's involvement or lack thereof in the events giving rise to this suit. Accordingly, Defendants have not established that there is no genuine dispute as to Officer Calanca's involvement and their unsupported attempt to get him off the hook must fail.

30

6. *The Village of Palatine's Liability*

Defendants point to Illinois statutes providing that "a municipality is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." ([78] at 12.) According to Defendants, because "Plaintiff has failed to prove her claims against the individual Defendants, she fails to prove her claims against the Village of Palatine." (*Id.*) The Court has determined herein that Plaintiff's claims against the individual Defendants are viable. Accordingly, the premise of Defendants' argument falls away and their contention as to municipal liability is unavailing.

**B.   Defendants' Motion to Strike**

Along with her summary judgment materials, Plaintiff submitted a declaration provided by Maria Melina Dominguez, a former employee of the Palatine Police Department. Defendants have moved to strike that declaration. However, the statements provided by Ms. Dominguez are immaterial to the determinations reached by the Court herein. Accordingly, Defendants' motion to strike is denied as moot to the extent it is directed to Ms. Dominguez's declaration. Defendants also request that Plaintiff's response brief be stricken under Local Rule 7.1 because it is longer than 15 pages. The Court, in its discretion, also denies that request.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment [76] is denied and Defendants' motion to strike [87] is also denied.

**SO ORDERED.**                                  **ENTERED:**


**DATE:**   <u>**October 31, 2024**</u>     _____

**HON. DANIEL P. McLAUGHLIN**
**United States Magistrate Judge**